1
2
3
4                    UNITED STATES DISTRICT COURT

5                   EASTERN DISTRICT OF CALIFORNIA

6
                                        1:08-CV-00128 OWW DLB
7   MARGARET A. SHEPHERD,

8         Plaintiff,                    MEMORANDUM DECISION RE;
                                        DEFENDANTS' MOTION FOR
                                        SUMMARY JUDGMENT (DOC. 30)
9              v.

10  OFFICER GARRET CRAWFORD, *et al.*,

11
          Defendants.
12

13

14                      I.   INTRODUCTION

15       This case arises out of the arrest of Plaintiff, Margaret

16  Shepherd, on January 14, 2007.  Plaintiff alleges that Officers

17  of the City of Modesto Police used excessive force incident to

18  her arrest, causing her injuries.  Before the court for decision

19  is a Motion for Summary Judgment filed by Defendants City of

20  Modesto ("City"), City of Modesto Police Sergeant Garret

21  Crawford, and City of Modesto Police Officers Douglas Griepp,

22  David Angarole, Todd Musto, Joseph Pimental, Tony Scopesi, and

23  Yair Oaxaca.  Doc. 30.[1]

24       Plaintiff's complaint asserts four claims based upon

25  _____

26       [1]   Defendants have also filed a motion to strike
    Plaintiff's expert witnesses.  Doc. 31, filed Feb. 13, 2009.
27  That motion is addressed in a separate memorandum decision.

28
                              1

allegations of excessive force and wrongful arrest: (1) violation
of Title 42, United States Code, Section 1983 against all
individual defendants; (2) assault and battery against all
individual defendants; (3) false arrest against all individual
defendants; and (4) violation of Section 1983 against the City of
Modesto related to alleged training and/or supervision
deficiencies.  Doc. 1, filed Jan. 25, 3008.  Plaintiff
voluntarily dismissed the false arrest claim as to all
defendants, Doc. 39, filed Mar. 24, 2009, as well as all claims
against Defendants Angarole and Musto, Doc. 40, filed Mar. 24,
2009.

## II.  FACTUAL BACKGROUND

It is undisputed that the events giving rise to Plaintiff's
arrest took place at approximately 1:00 a.m. on January 14, 2007.
Compl. at ¶6.  At that time, Plaintiff was at a club called the
Copper Rhino Sun in the downtown entertainment district of
Modesto, California, with approximately ten other individuals
celebrating the twenty-first birthday of Plaintiff's son.  *Id.*
It is also undisputed that Plaintiff consumed three drinks that
evening, a small glass of champagne and two white Russians.
Margaret Shepherd Depo. at 32, 43-44, 47-48.  In almost all other
respects, the parties' versions of the events of that evening are
in conflict.

According to the owner of the Copper Rhino, Mr. Leslie
Knoll, Plaintiff's group was loud and obnoxious, and at least one
member of the group was insulting other customers.  Knoll Depo.
at 13.  After unsuccessfully requesting Plaintiff's group to

2

quiet down, Mr. Knoll contacted one of his private security guards (Defendant Griffin Dye) and told him to remove Plaintiff's group from the bar. *Id.* at 13-14. Dye then informed one of the members of the group, Larry McKenzie, that he was being "a problem" and would have to be walked outside. Dye Depo. at 21.

According to Plaintiff, Larry ended up on the ground with Dye standing over him. M. Shepherd Depo. at 77. One of Plaintiff's sons, Lucas Shepherd, hollered at Dye "What are you doing? He's just wanting to get his hat." *Id.* Then, according to Plaintiff, there was a lot of pushing and shoving, with people trying to get out of the club. *Id.* at 78; *see also* Amy Shepherd Depo. at 20. Plaintiff recalls that Dye then grabbed her son Lucas around the neck in a choke hold. *Id.* Other witnesses, including Lucas, recall that Lucas ended up being thrown to the ground by one of the bouncers, possibly Dye. Wheeler Depo. at 20-22; L. Shepherd Depo. at 26, 29-30.

In contrast, Dye recalls that Larry began to leave the premises peacefully and that some other members of the group began to gather up their things to leave with him. Dye Depo. at 23. However, as Dye and Larry were leaving the club's patio, where Larry and the others had been socializing, Dye heard someone yelling from behind him. *Id.* at 23-24. Dye turned around and observed Lucas, who had just entered the patio area from the bar, running after him. *Id.* at 24. The next thing Dye saw was "the ground." He cannot recall whether Lucas knocked him to the ground, or whether he was knocked to the ground by the rush of others leaving the club. *Id.* at 25.

According to Knoll, the club's owner, the situation

**3**

escalated, resulting in individuals within Plaintiff's group hitting the security guards. Knoll Depo. at 19.

At some point, either while the party was moving outside or shortly after, officers from the Modesto Police Department began arriving on the scene. One of the first officers to arrive was Sergeant Crawford, who observed what he characterized as "a large melee." Crawford Depo. at 41. Crawford noticed eight or nine individuals actively engaged in fighting with security guards on the sidewalk. In response, the security guards were attempting to place handcuffs on certain individuals and trying to arrest the assailants. *Id.* at 32.

A number of police officers eventually responded to the scene, including at least two on horseback. These officers became occupied with the apprehension of various individuals and/or restoring order to the scene.

According to Sergeant Crawford, as he approached the crowd, his attention was drawn to a white, female adult (later identified as Plaintiff), because she was on the back of a security officer (Dye). She appeared to have her right arm around the security officer's throat, holding him in a head lock. Crawford recalls that Plaintiff's feet were off the ground, as though she was "riding" on the security officer's back. *Id.* at 33, 46. Crawford observed that the same security officer was attempting to place handcuffs on a male subject. *Id.* at 46-47. In response, Sergeant Crawford claims he approached Plaintiff, grasped her free (left) arm with his left hand, and identified himself loudly as a Modesto Police Officer. *Id.* at 33. She did not respond. *Id.* Plaintiff remained on the guard's back,

screaming: "Let go of my son." *Id.* at 47.

Crawford believed that the guard was in "obvious distress" during this altercation, because he was in a headlock while trying to handcuff someone. *Id.* at 47. Crawford again yelled in Plaintiff's presence that he was a police officer, while still holding on to her left arm with his left hand. *Id.* at 49-50. Crawford then took Plaintiff's left arm and pulled it up behind her back. *Id.* at 50. He ordered her for a third time to release the guard and again told her he was a police officer. *Id.* at 52. Crawford then put his right hand on her right shoulder and pulled it straight back, away from the security officer. *Id.* Her arm came out from around the guard's neck, and she fell backward. *Id.* at 53. According to Crawford, Plaintiff landed on her feet at first, but then stumbled and bumped into someone else, knocking that person to the ground and falling on top of that person. *Id.* That caused Crawford to lose his grip on her. *Id.*

At this point, according to Crawford, Plaintiff became hysterical, screaming about why her son was being arrested, flailing her arms and feet "in all directions, striking out, hitting and kicking anybody in the area." *Id.* at 56. Crawford asserts that "[t]rying to gain control of [Plaintiff's] hands and feet was quite dangerous at that point." *Id.* at 57. Crawford was standing on his feet, bending over at his waist, trying to grab her hands and place her in handcuffs. *Id.* Although he was able to get one of her hands, he could not grab the other one. *Id.* That is when Officer Griepp approached. *Id.* Crawford waived him over to assist. Griepp was able to grab the other arm. *Id.* She was still screaming hysterically and resisting

arrest.  She managing to pull away several times as they placed her in handcuffs.  *Id.* at 64-64.

Crawford maintains that neither officer placed his knees on her back.  *Id.* at 64.  Crawford asserts that he purposefully avoided doing so, because lowering himself to the ground would have allowed her flailing arms and feet to hit his body.  *Id.* Crawford was also concerned about a nearby horse, belonging to a mounted policeman.  Crawford did not want to go any lower on the ground, to avoid potential contact with the horse.  *Id.*

Once Plaintiff was ultimately restrained, Officers Crawford and Griepp escorted Plaintiff to a patrol car and placed her in the back seat of that car, where she stayed until being transported to another police vehicle for transport to jail.  *Id.* at 68:8-19.

Crawford's version of events is corroborated by Knoll, who testified that he personally observed "the police dragging a lady off who was trying to choke [Dye]."  Knoll Depo. at 20-21.  Knoll stated: "It looked like she was on the pile and was trying to either hit or choke him.  I just caught a glimpse of it, so I don't know exactly."  *Id.* at 21.

For his part, Dye does not recall anyone trying to choke him that evening, nor does he have any recollection of Plaintiff. Dye Depo. at 33.

Plaintiff's recollection of the arrest is dramatically different than Crawford's.  She asserts that she was propelled outside the club onto the sidewalk with the rush of bodies leaving the club.  M. Shepherd Depo. at 83.  Observing one of the security guards with his arm around her son Lucas' neck, she

yelled: "What are you doing to my son?" *Id.* The guard did not acknowledge her. *Id.* She then reached up to touch the bouncer's arm in order to get his attention because she wanted to know what he was doing to her son. *Id.* at 82. Then, with no warning or provocation, someone pulled her right arm back and she felt a pain in her shoulder. *Id.* at 88. Then, her feet left the ground and she was slammed face first into the ground, onto her chest. *Id.* at 89. Plaintiff then recalls feeling a great deal of pressure and pain in her back. *Id.* at 91. She felt a weight on her back and her arms were pulled behind her. *Id.* at 92. She recalls that she "couldn't breathe," and her arms felt like they were going to be pulled off. *Id.* at 92-93. She was trying to gasp for air and then "started seeing stars." *Id.* at 93. Next, she felt pain on her wrists. She assumes this was caused by the officers putting handcuffs on her. *Id.* at 94. She was "yanked up to [her] feet," at which time she realized police officers were present. *Id.* at 95-96. She was then guided to a police car. *Id.* at 96-97.

One witness recalls that Crawford "jumped down onto [Plaintiff's] back, and [] had his knees in her back." Wheeler Depo. at 25. Others corroborate that at least one of the officers had his knees in her back. A. Shepherd Depo. at 29; D. Shepherd Depo. at 45.

It is undisputed that at the time of the incident, Plaintiff was over 50 yeas of age, was 5 feet, 4 inches tall, and weighed 150 pounds. *Id.* at 80. Crawford was 5 feet, 10 inches tall, and weighed 230 pounds.

Ultimately, Plaintiff was cited for a violation of

California Penal Code section 148 for delaying and obstructing a police officer.  The police report states:

> On 1-14-07 at approximately 0051 hours I responded to a report of a fight at the Copper Rhino on 10th St.  On arrival I saw a security guard attempting to handcuff a suspect on the sidewalk (D) grabbed the security guard around the neck from behind and attempted to pull him from her son, Andrew Shepherd.  I ordered (D) to release the guard and she refused.  I pulled (D) by her arms away from the guard and she fell to the ground on top of a bystander.  (D) began to punch and kick at anyone she could while on the ground.  I told (D) she was under arrest and to stop fighting.  (D) refused and continued to fight.  (D) was handcuffed by Officer Griepp and myself.  (D) booked to Stanislaus County jail.

Arrest Report prepared by Sergeant Crawford, Ex. P to Gilbert Decl., Doc. 30-4 through 30-10.

## III.  STANDARD OF DECISION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable

trier of fact could find other than for the moving party."
*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.
2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d
885, 888 (9th Cir. 2003) (noting that a party moving for summary
judgment on claim as to which it will have the burden at trial
"must establish beyond controversy every essential element" of
the claim) (internal quotation marks omitted). With respect to
an issue as to which the non-moving party will have the burden of
proof, the movant "can prevail merely by pointing out that there
is an absence of evidence to support the nonmoving party's case."
*Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and
supported, the non-movant cannot defeat the motion by resting
upon the allegations or denials of its own pleading, rather the
"non-moving party must set forth, by affidavit or as otherwise
provided in Rule 56, 'specific facts showing that there is a
genuine issue for trial.'" *Id.* (*quoting Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative
testimony in affidavits and moving papers is insufficient to
raise genuine issues of fact and defeat summary judgment." *Id.*

To defeat a motion for summary judgment, the non-moving
party must show there exists a *genuine* dispute (or issue) of
*material* fact. A fact is "material" if it "might affect the
outcome of the suit under the governing law." *Anderson*, 477 U.S.
at 248. "[S]ummary judgment will not lie if [a] dispute about a
material fact is 'genuine,' that is, if the evidence is such that
a reasonable jury could return a verdict for the nonmoving
party." *Id.* at 248. In ruling on a motion for summary judgment,

1   the district court does not make credibility determinations;

2   rather, the "evidence of the non-movant is to be believed, and

3   all justifiable inferences are to be drawn in his favor."  *Id.* at

4   255.

5

6                            IV.  DISCUSSION

7        A.   Claims against Officers Pimental, Scopesi, and Oaxaca.

8        Defendant moves for summary judgment as to all claims

9   against Officers Pimental, Scopesi, and Oaxaca on the ground

10  that, although all five officers were present during the brawl at

11  the Copper Rhino, only two officers (Crawford and Griepp) were

12  involved in Plaintiff's arrest.[2]

13       The Complaint is vague about the various Officers' conduct,

14  alleging:

15                Two or three Modesto Police officers, including
                  defendants CRAWFORD and GRIEPP jumped on Plaintiff.
16                One of the officers pinned Plaintiff to the ground with
                  his knee and broke four of her ribs.
17
18  Compl. at ¶10.  In response to special interrogatories asking

19  Plaintiff to identify all facts which support her contention that

20  each of these individual officers was liable for the incident

21  giving rise to this litigation, Plaintiff stated:

22                I don't know which officers did what.  I just know one
                  or two of them threw me to the ground and wrenched my
23                arms back so hard I thought they were going to
                  be ripped from the sockets at my shoulders and then
24                excruciating pain in my back making my body bow up
                  backwards and being unable to breath.  Then being
25                yanked up by the handcuffs on my wrists, shoved to a
                  police care (sic) and thrown into the back of it.  When
26
       ─────────────────
27          [2]    Plaintiff has voluntarily dismissed all claims against
    two additional officers:  Officers Angarole and Mustaro.  Doc.
28  39, filed Mar. 24, 2009.

                                   10

> I tried to convey many times the pain I was in and that
> I couldn't breath, at one point I was told, "If I could
> open my big mouth, I could breath."  and while being
> transported in the police car, I stated the bouncer
> should not have touched my son; the officer replied
> "Maybe you should have stayed out of our town."

Response to Special Interrogatory No. 1, attached to the

Declaration of Kevin Gilbert, Doc. 30-4 through 30-10, Ex. N.

With respect to Defendants Pimental, Scopesi, and Oaxaca,

Plaintiff indicated that she "[did] not know which officers did

what."  Responses to Special Interrogatories Nos. 9-11.

Plaintiff has not identified any facts suggesting any of the

three officers were in any way involved in her physical restraint

and/or arrest.  Instead, she argues that Officers Pimental,

Scopesi, and Oaxaca must have been aware that she was being

subjected to "constitutionally unreasonable force during her

arrest," but "did nothing to prevent the abuse" and therefore

should be "subject to personal liability for their failure to

act."  Doc. 342 at 8.  In support of her theory of liability,

Plaintiff cites *Byrd v. Clark*, 783, F.2d 1002, 1007 (11th Cir.

1986), abrogation on other grounds recognized by *Nolen v. Isbell*,

207 F.3d 1253, 1255-56 (11th Cir. 2000), which held that when "a

police officer, whether supervisory or not, fails or refuses to

intervene when a constitutional violation such as an unprovoked

beating takes place in his presence, the officer is directly

liable under Section 1983."

Defendants rejoin by citing a line of California cases which

stand for the proposition that police officers do not generally

owe a duty of care to protect members of the public, unless a

special relationship is established.  For example, *Davidson v.*

11

*City of Westminster*, 32 Cal. 3d 197 (1982), held that officers conducting surveillance of a business were under no duty to warn an innocent third party known to be alone on the premises of the arrival of a suspected assailant.  Neither the decision to conduct the surveillance, the observation of the potential assailant in the victim's presence, nor the recognition of the assailant as the likely perpetrator of a previous assault created a "special relationship" between the victim and the police that gave rise to a duty to act or warn.  *Id.* at 206-207; *see also Williams v. State*, 34 Cal. 3d 18 (1983) (California state highway patrol officer has the right, but not the duty to investigate accidents, or come to the aid of stranded motorists, and that stopping to aid an injured or stranded motorist does not, in itself, create a special relationship which gives rise to an affirmative duty to secure information or preserve evidence for civil litigation between the motorist and third parties).

But, the Ninth Circuit recognizes that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citing *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81 (1996)).  "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede."  *Cunningham*, 229 F.3d 1289.  If an officer was not present, or had "no realistic opportunity to intercede," no liability will attach.  *Id.*

There is scant authority applying "failure to intercede" liability in the context of the use of excessive force.  In the

12

corrections context, a prison guard has an affirmative duty to intervene on behalf of a prisoner if other officers are violating the prisoner's constitutional rights in his presence, or if he knows that the prisoner's rights are being violated. *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). However, there must be a causal connection between the defendant and the deprivation of a constitutional right. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In the policing context, where defendant officers failed to act in the presence of an alleged use of excessive force by other officers, "factors such as whether the defendant had reasonable time to intervene, and whether the defendant had tacitly collaborated with the officers using force should be considered." *Garcia v. Grimm*, 2007 WL 2778360, *6 (S.D. Cal. 2007) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). The reasoning of the Second Circuit in *O'Neill* is instructive:

> In this case, the claim that [Officer] Conners became liable for use of excessive force by failing to intercede must be assessed separately with respect to the acts of [Officers] Fiorillo and Krzeminski in striking O'Neill and the act of Krzeminski in dragging O'Neill across the floor by his throat. Even when the evidence is viewed in the light most favorable to the plaintiff, there is insufficient evidence to permit a jury reasonably to conclude that Conners' failure to intercede was a proximate cause of the beating. The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator. With respect to the subsequent dragging of O'Neill across the floor, however, the case against Conners is adequate to create an issue of fact for the jury. Having seen the victim beaten, he was alerted to the need to protect O'Neill from further abuse. Though not a guarantor of O'Neill's safety in the face of brutality administered by other officers, Conners can be found liable for deliberately choosing

13

not to make a reasonable attempt to stop Krzeminski. *Id.* at 11-12. Critically, the evidence in *O'Neill* subjected the officer to liability for "deliberately choosing not to make a reasonable attempt" to stop another officer's allegedly unconstitutional conduct because he <u>actually observed that conduct</u>.

Here, in contrast, the relevant testimony of Oaxaca, Pimental, and Scopesi, which is undisputed, indicates that none of the three officers observed Crawford and/or Griepp placing Plaintiff under arrest.

Officer Oaxaca, who was Griepp's partner at the time of the incident, arrived on the scene with Griepp in their police cruiser. As soon as they got out of the car, Griepp went to assist Crawford, and Oaxaca turned in the other direction to "protect them from the surrounding crowd." Oaxaca Depo. at 20. Oaxaca did not see Griepp and Crawford arrest Plaintiff because he had his back to them the entire time. *Id.*

Plaintiff emphasizes that, according to Crawford's version of the event, Plaintiff was screaming hysterically as she was being handcuffed. Plaintiff argues that even if Oaxaca had his back to Plaintiff during the arrest, Oaxaca must have heard her screaming, as it is undisputed that he was positioned only a short distance from the site of Plaintiff's arrest. However, Oaxaca was not asked during his deposition whether he heard Plaintiff screaming over the noise of the melee. Plaintiff's claim is based on no more than speculation. Plaintiff has no facts to support her assertion that Oaxaca actually observed (either visually or auditorily) the allegedly unconstitutional

conduct. Accordingly, no reasonable finder of fact could conclude that Oaxaca had a duty to intervene on Plaintiff's behalf. Oaxaca is entitled to summary judgment on the First Cause of Action.

Officer Pimental, who responded to the Copper Rhino on horseback, testified at his deposition that he observed Plaintiff on top of a "dog pile" of people. Pimental Depo. 19-20. He observed Sergeant Crawford arrive on the scene, but did not have an opportunity to observe any of Crawford's conduct toward Plaintiff because his attention was diverted toward other people coming out of the Copper Rhino. Among other things, Pimental was distracted by another member of Plaintiff's group, Melody Wheeler, who was trying to move around his horse toward the pile of people. *Id.* at 22. Pimental instructed her not to move around his horse and to back away, but she did not comply. *Id.* at 23. Pimental grabbed Wheeler and escorted her away, at which time he handed her off to a ground officer to place her in the car for him. He then placed Wheeler under arrest. *Id.* Again, there is no evidence which would permit a reasonable finder of fact to conclude that Pimental had a duty to intervene on Plaintiff's behalf.

Officer Scopesi, who was also on horseback, trying to control the crowd, observed Plaintiff "on the back of a security officer" with her "arm around [his] neck from behind." Scopesi Depo. at 22. However, that was all he observed in connection with Plaintiff. He did not see officer Crawford approach or take any actions in connection with the arrest, because he was dealing with the crowd. *Id.* at 25. No reasonable finder of fact could

conclude that Scopesi had a duty to intervene on Plaintiff's behalf.

Plaintiff has no evidence suggesting that Officers Oaxaca, Pimental, or Scopesi observed Crawford and Griepp's conduct in connection with her arrest. Defendants Oaxaca, Pimental, and Scopesi are entitled to summary judgment on the First Cause of Action.[3]

### B. Count VI - Section 1983 *Monell* Claim Against the City of Modesto.

Defendants move for summary judgment on Plaintiff's Fourth Cause of Action, which alleges that the City of Modesto violated her constitutional rights. "Local governments are only liable under § 1983 for constitutional torts that amount to a custom or policy." *Picray v. Sealock*, 138 F.3d 767, 772 (9th Cir. 1998) (citing *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978)).

A Plaintiff can establish municipal liability in one of three ways: "(1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent

---

[3] Nor could any of the three officers possibly be liable for assault and battery upon Plaintiff, as it is undisputed that none of them touched her. Plaintiff has indicated her intent to dismiss the false arrest claims against all defendants. Doc. 32 at 9.

official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008. After proving that one of the three circumstances existed, Plaintiff must also show that the circumstance was the proximate cause of the constitutional deprivation. *Van Ort v. Estate of Stanewich*, 92 F.2d 831, 836 (9th Cir. 1996).

Here, there is no evidence to support a *Monell* claim. Plaintiff argues that the City of Modesto requires supervisors to file reports when injuries occur incident to arrest and when there has been a use of force. Doc. 32 at 8. Plaintiff emphasizes that neither an injury report nor a use of force report were filed "despite the fact that Plaintiff suffered serious injuries and was the object of force sufficient to cause those injuries." *Id.* Plaintiff also complains that the fact that the reports were never filed was never investigated by a supervisor. *Id.*

Plaintiff cites *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), for the proposition that the failure to investigate a single, unconstitutional beating by police constitutes sufficient evidence to raise a question of fact as to the training and investigative policies of the police.

Plaintiff overreaches by asserting *Marchese* controls here. In *Marchese*, a prisoner, who was under the complete control of sheriff's officers, was severely beaten on two separate occasions in apparent retaliation for pointing a gun at an officer. *Id.* at 182. Among other things, the Sixth Circuit was concerned with

17

the fact that the record did not identify any participant in these "obviously illegal assaults (although supervisory officers were present at both)." *Id.* at 188. The evidence presented at trial was "such as to demand acceptance of the fact that 1) the shift officers on duty knew when this assault was going to take place, 2) heard it in progress and 3) sought to the degree possible, to cover up the attack after it occurred." *Id.* at 187. *Marchese* concluded:

> [T]he "official policy" of the sheriff and the County of Wayne as represented by him in police matters [was that]... where a citizen had made a life-threatening gesture by pointing a gun at a sheriff's deputy, [his] subsequent assault by brother officers ... would not engender either <u>serious investigation to discover the perpetrators</u> or official sanctions against their conduct. It is this latter official policy which we [] regard as ratification of the illegal acts of the unidentified officers....

*Id.* at 188.

Plaintiff asserts that the present case is like *Marchese*, pointing to Modesto Police Department General Order 1.06, on the "Use of Force," which provides that every us of force, "other than voluntary submission to arrest or" or force used to "overcome 'passive' resistance,'" should be documented in a use of force report. Harden Depo., Ex. 5, p. 16 of 17, ¶ VIII.A. When asked to review a copy of Sergeant Crawford's written report of the incident, *id.* at Ex. 6, Michael Harden, Assistant Chief of the Modesto Police Department, indicated that, according to Crawford's description of the event, Plaintiff put up "more than passive" resistance. Harden Depo. at 49. Harden, who is one of Crawford's ultimate supervisors, could not explain why no use of force report was filed, indicating that he did not "know what was

18

in Sergeant Crawford's mind at the time." *Id*. at 49. Plaintiff asserted during oral argument that the City's failure to investigate why Crawford failed to file a use of force report constitutes "ratification" of Crawford's conduct, as did the failure to launch an investigation to discover the officers who perpetrated the beatings in *Marchese*. This reads too much into Harden's testimony. Harden qualified his comments regarding Crawford's failure to file a report:

> It is telling for me to read the report and find that she lost her footing and fell to the ground. That would imply to me that he did not necessarily manipulate her to the ground, that she fell to the ground on her own. So that was not part of the use of force. Once on the ground, she flailed her arms and what have you. While that may seem more than passive, yes, you are asking me to speculate on why Sergeant Crawford may not have done something, and I just don't know.

*Id*. at 50. Here, unlike in *Marchese*, there are legitimate disputes regarding the need for and nature of the force utilized. According to Harden, Crawford's written report contains information that could explain why he did not file a use of force report. Further distinguishing the *Marchese* decision, there is no evidence here of a cover-up or any effort to conceal the identity of the officers involved in Plaintiff's arrest. Their names, and the names of all other officers responding to the Copper Rhino that evening, were revealed to Plaintiff during discovery. On the other hand, if Plaintiff's description of the events is true, the arresting officer should arguably have prepared a report if Plaintiff was thrown to the ground and an officer kneeled on her back while she resisted arrest. If those facts are believed, the failure to file a use of force report is

19

a violation of Modesto Police Department policy and was followed by a failure to investigate.

Plaintiff's *Monell* Claim is marginal, but cannot be resolved as a matter of law.  Defendants' motion for summary judgment on the Fourth Cause of Action is DENIED.

### C.  Section 1983 Claim against Sergeant Crawford and Officer Griepp.

#### 1.  Section 1983.

Section 1983 creates a cause of action against any person who, acting under the color of state law, violates rights established by the Constitution or the laws of the United States. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002).  "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials."  *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).  To prevail on a section 1983 claim, Plaintiff must show (1) Defendants acted under color of state law and (2) violated Plaintiff's federal constitutional or statutory rights. *Dawson v. City of Seattle*, 435 F.3d 1054, 1061 (9th Cir. 2006)(citing West *v. Atkins*, 487 U.S. 42, 48 (1988)).

Here, there is no dispute that the Defendant Officers acted under color of law.  The question is whether Defendants violated Plaintiff's federal constitutional rights.  Plaintiff asserts that she was subject to excessive force, which implicates the

Fourth Amendment.[4]  Defendants assert the defense of qualified
immunity.


2.   <u>Qualified Immunity.</u>

The Supreme Court recently summarized the purpose of
qualified immunity:

> The doctrine of qualified immunity protects government
> officials "from liability for civil damages insofar as
> their conduct does not violate clearly established
> statutory or constitutional rights of which a
> reasonable person would have known." *Harlow v.
> Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified
> immunity balances two important interests-the need to
> hold public officials accountable when they exercise
> power irresponsibly and the need to shield officials
> from harassment, distraction, and liability when they
> perform their duties reasonably. The protection of
> qualified immunity applies regardless of whether the
> government official's error is "a mistake of law, a
> mistake of fact, or a mistake based on mixed questions
> of law and fact." *Groh v. Ramirez*, 540 U.S. 551 (2004)
> (Kennedy, J., dissenting) (citing *Butz v. Economou*, 438
> U.S. 478, 507 (1978) (noting that qualified immunity
> covers "mere mistakes in judgment, whether the mistake
> is one of fact or one of law")).

> Because qualified immunity is "an immunity from suit
> rather than a mere defense to liability ... it is
> effectively lost if a case is erroneously permitted to
> go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526
> (1985) (emphasis deleted). Indeed, we have made clear
> that the "driving force" behind creation of the
> qualified immunity doctrine was a desire to ensure that
> "'insubstantial claims' against government officials
> [will] be resolved prior to discovery." *Anderson v.
> Creighton*, 483 U.S. 635, 640, n. 2 (1987). Accordingly,
> "we repeatedly have stressed the importance of
> resolving immunity questions at the earliest possible
> stage in litigation." Hunter v. Bryant, 502 U.S. 224,
> 227 (1991) (per curiam).

*Pearson v. Callahan*, 129 S. Ct. 808 (Jan. 21.2009) (parallel

---

[4]    Plaintiff has voluntarily dismissed her unlawful arrest
claim, Doc. 40, and did not suggest in her papers or at oral
argument that she intends to pursue a § 1983 claim based on false
arrest.

citations omitted).

Deciding qualified immunity normally entails a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court must ask whether, taken in the light most favorable to the plaintiff, the facts alleged show the officers' conduct violated a constitutional right. *Id.* In addition, a court must also inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that the defendant's actions were lawful. *Id.*

The traditional summary judgment approach should be used in analyzing the first step of the *Saucier* analysis:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right? Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-11 (9th Cir.2004) (internal citations and quotations omitted). In the second step, the court must ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted. Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th. Cir.2003) (citing *Saucier,* 533 U.S. at 216 (Ginsburg J., concurring)). District courts have discretion to determine the order in which these inquiries take place. *Pearson*, 129 S. Ct. at 818-822.

22

### 3. Qualified Immunity Applied to Excessive Use of Force Claim.

An officer is justified in using "reasonable force" in effectuating the arrest to the extent the force employed was objectively reasonable. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 395-397 (1989)).

When analyzing excessive force claims, a court's initial inquiry is "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Graham*, 490 U.S. at 397). A court must "consider the facts underlying an excessive force claim from the perspective of a reasonable officer on the scene, without regard to the arresting officer's subjective motivation for using force." *Id.* (citing *Graham*, 490 U.S. at 396-97). "Whether a particular use of force was 'objectively reasonable' depends on several factors, including the severity of the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect was resisting arrest." *Id.* (citing *Graham,* 490 U.S. at 396).

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97.

Applying the second step of the *Saucier* analysis, a court must ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted. Although this inquiry is primarily a legal one, where the reasonableness

of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate." *Wilkins*, 350 F.3d at 956.[5]

Plaintiff relies on *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), to assert that the Sergeant Crawford and Officer Griepp's conduct was clearly unreasonable. In *Deorle*, the plaintiff, an emotionally disturbed man, was injured when a police officer fired a lead-filled "beanbag round" into his face. The officer did so even though it was undisputed that Deorle "was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense." *Id.* at 1275. The approach taken by the Ninth Circuit is instructive.

In determining whether the officer used excessive force, the Ninth Circuit asked whether the officer made a "reasonable

---

[5] Defendant correctly points out that an officer is entitled to summary judgment if he had a reasonable, though mistaken, view of either the law or the facts. "An officer might correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." *Saucier*, 533 U.S. at 205. "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* "The converse also is true: Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." *Jeffers v. Gomez*, 267 F. 3d 895, 909 (9th Cir. 2001). But, these rules do not displace the traditional summary judgment process. A court may not resolve on summary judgment disputes that go to the reasonableness of the officer's belief that the conduct was lawful or the credibility of the officer's own recollection of the facts.

mistake as to the legality of his actions." *Id.* at 1285 (citing *Saucier*, 533 U.S. at 206).

> We assume, arguendo, that [the officer] thought that the force he used was not excessive; however, that is not the issue. Rather, the question is whether [the officer's] use of force was premised on a reasonable belief that such force was lawful, or, as the Supreme Court recently put it: "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [Saucier, 533 U.S. at 213]. The Court also explained the purpose of the rule: "[q]ualified immunity operates ... to protect officers from the sometimes hazy border between excessive and acceptable force." *Id.* at [206]. It helps, therefore, to begin our discussion with the observation that, on the basis of the facts we have discussed, this is by no means a borderline case. It should have been clear to any reasonable officer that, under the circumstances present, firing at Deorle was objectively unreasonable.
>
> Every police officer should know that it is objectively unreasonable to shoot-even with lead shot wrapped in a cloth case-an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals. Here, all those factors were present. Deorle had complied with the police officers' instructions, had discarded his potential weapons whenever asked to do so, and had not assaulted anyone; in addition, a team of negotiators essential to resolving such situations was en route.

*Id.*

The Ninth Circuit held that "[a]lthough there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle [the officer] to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established." *Id.* at 1285-86.

> Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct. When "'the defendant ['s] conduct is so patently violative of the

> constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir.1994) (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993)). This is such a case. No reasonable officer could have believed that Rutherford's action in shooting Deorle with the "less lethal" lead-filled beanbag round was appropriate or lawful.

*Id.* at 1286.

Plaintiff asserts that this case is like *Deorle*, because "the force applied [] to plaintiff's back by the knees of two police officers, one of whom weighed 230 pounds, was sufficient to break four ribs and cause multiple pneumothorax." Doc. 32 at 11. But, the nature of the force applied was not evaluated in a vacuum in *Deorle*. Plaintiff correctly notes that the *Deorle* court took the "character of the offense" into consideration, noting that the officer had not observed Deorle harming or attempting to harm anyone. He had merely been "roam[ing] about the area and shout[ing] in an irrational manner." *Id.* at 1282. Therefore, "the crime being committed, if any, was minor and the danger to [the officer] and others appears to have been minimal." *Id.* Plaintiff suggests that, similar to Deorle, she "was no threat to anyone and committed no crime but for yelling at a security guard." Doc. 32 at 11.

Whether the reasonableness of the officers' belief that their conduct was lawful "depends on the resolution of disputed issues of fact." *Wilkins*, 364 F.3d at 1110-11. If so, summary

26

judgment is not appropriate.  *Id.*[6]  Although the Supreme Court

warned in *Saucier* that "to deny summary judgment any time a

material issue of fact remains on the excessive force claim ...

could undermine the goal of qualified immunity to avoid excessive

disruption of government and permit the resolution of many

insubstantial claims on summary judgment,"  533 U.S. at 202

(internal citations and quotations omitted), Justice Ginsburg

clarified in her concurring opinion that "[o]f course, if an

excessive force claim turns on which of two conflicting stories

best captures what happened on the street, *Graham* will not permit

---

[6]    Plaintiff suggests that whether the amount of force
used was constitutionally excessive is <u>always</u> for the jury to
determine.   She cites *Byrd v. Clark*, 783 F.2d 1002, 1006 (11th
Cir. 1986),  in which, on summary judgment, the Eleventh Circuit
found there was a triable dispute as to whether force was applied
to plaintiff <u>after</u> she ceased to resist arrest.   The Eleventh
Circuit also reasoned that the severity of the injuries suffered
by plaintiff, while "not the determinative factor in assessing
whether or not a constitutional violation has occurred," was
"certainly probative of the amount of force used."  *Id.*   The Byrd
court held:

> From the severity of an injury, it would be permissible
> for a jury to infer that substantial force was applied
> to the plaintiff. Whether that force was
> constitutionally excessive under these facts, is for
> the jury to determine.

*Id.* at 1006-1007.  *Byrd* does not, as Plaintiff suggests, stand
for the proposition that every time a serious injury results from
the application of force, summary judgment is unwarranted.
Rather, Byrd stands for the unremarkable proposition that, where
facts material to the reasonableness of the force applied are in
dispute, the severity of injury may give rise to an inference
that the force used was excessive.   Under such circumstances,
summary judgment is inappropriate.

summary judgment in favor of the defendant official," *id*. at 216.

Here, we have "two conflicting stories" regarding "what happened on the street." Although Sergeant Crawford testified that he saw Plaintiff holding Dye in a choke hold, Plaintiff denies this. According to Plaintiff's version of the events, she was reaching up to touch Dye on the arm to get his attention when she was lifted off her feet and thrown to the ground face first. Once she was down, Plaintiff asserts Crawford and/or Griepp placed their knees on her back. Crawford and Griepp deny placing their knees on Plaintiffs back and assert that the force used was necessary because she was flailing around and resisting arrest. Plaintiff denies doing so and denies resisting arrest.

The court's initial inquiry is "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Graham*, 490 U.S. at 397). A court must "consider the facts underlying an excessive force claim from the perspective of a reasonable officer on the scene, without regard to the arresting officer's subjective motivation for using force." *Id.* (citing *Graham*, 490 U.S. at 396-97). "Whether a particular use of force was 'objectively reasonable' depends on several factors, including the severity of the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect was resisting arrest." *Id.* (citing *Graham,* 490 U.S. at 396).

Here, a melee, a potential riot, is a dangerous disturbance. However, there are considerable factual disputes about the nature of Plaintiff's actions prompting the use of force and whether she resisted arrest. The reasonableness of the officers' belief that

their conduct was lawful cannot be determined on summary judgment. Viewing the facts in a light most favorable to plaintiff, if she was only trying to get the security guard's attention to make a request and did not resist arrest, a reasonable finder of fact could conclude that the force applied in this case was objectively unreasonable under the circumstances. This is exactly the type of factual dispute that is not amenable to summary adjudication.

## V.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is:

(1) GRANTED as to all claims against Officers Pimental, Scopesi, and Oaxaca;

(2) DENIED as to the section 1983 claim against the City of Modesto;

(3) DENIED as to the section 1983 excessive force claims against Sergeant Crawford and Officer Griepp.

Defendants shall submit a form of order consistent with this memorandum decision within five (5) days of electronic service.


IT IS SO ORDERED.

Dated: __March 27, 2009__          _____/s/ Oliver W. Wanger_____
                                    UNITED STATES DISTRICT JUDGE

29