1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARGARET A. SHEPHERD | 1:08-CV-00128 OWW DLB |
| Plaintiff, | MEMORANDOM DECISION AND ORDER RE DEFENDANTS' REQUEST |
| v. | FOR ATTORNEYS FEES (DOC. 96) |
| OFFICER GARRETT CRAWFORD, *et al.*, | |
| Defendant. | |

## I. INTRODUCTION

Prevailing Defendants, individual Police Officers with the City of Modesto Police Department, seek to recover attorney's fees incurred defending themselves against a civil complaint brought by Plaintiff Margaret A. Shepherd. Defendants assert they are entitled to attorney's fees pursuant to Federal Rule of Civil Procedure 37(c)(2), because Plaintiff denied certain requests for admission regarding her allegations of liability. Doc. 96 at 10-11. Alternatively, several of the Officer Defendants move to recover their defense costs as sanctions under Federal Rule of Civil Procedure 11, on the ground that Plaintiff continued to prosecute

1

her case against them despite clear evidence confirming they were "uninvolved" in her arrest.  *Id.* at 11-13. Finally, Defendants rely on California Code of Civil Procedure § 1038, which authorizes a court to order reimbursement of attorney's fees incurred defending against any claim brought under the California Tort Claims Act ("CTCA") upon a finding that the claims were not brought in good faith and with reasonable cause. Defendants assert that Plaintiff brought her action against the five "uninvolved" officers without reasonable cause, and maintained claims against them despite the fact that discovery "confirmed that only two of the seven officers ever touched her or were in any way involved in her arrest."  Doc. 96 at 14.  Defendants seek a fee award of $77,371.25, representing half (50%) of the fees incurred by Defendants in defending against Plaintiff's claims.  *Id.* at 2.[1]

Plaintiff alleged that Defendant Officers used excessive force incident to her January 14, 2007 arrest outside a nightclub in Modesto, California, causing her injuries.  She originally asserted four claims based upon

---

[1] Despite occasionally mentioning "cost" recovery, this motion does not request any cost award, nor are attorneys fees sought under 42 U.S.C. section 1988.  Defendants point out that they separately filed a bill of costs on July 2, 2009, in the amount of $8,171.33, to which Plaintiff has filed no objections.  Recoverable costs under 28 U.S.C. sections 1920 and 1921 are not here in issue.

allegations of excessive force and wrongful arrest:

> (1) Violation of Title 42, United States Code, Section 1983 against individual defendants City of Modesto Police Sergeant Garret Crawford, and City of Modesto Police Officers Douglas Griepp, David Angarole, Todd Musto, Joseph Pimental, Tony Scopesi, and Yair Oaxaca as defendants;
>
> (2) Assault and battery against all individual defendants;
>
> (3) False arrest against all individual defendants; and
>
> (4) Violation of Section 1983 against the City of Modesto related to alleged training and/or supervision deficiencies.

Doc. 1, filed Jan. 25, 3008.  Plaintiff voluntarily dismissed the false arrest claim as to all defendants, Doc. 37, filed Mar. 30, 2009, as well as all claims against Officers Angarole and Musto, Doc. 40, filed Mar. 24, 2009.

Defendants' motion for summary judgment was granted in part.  Doc. 45, Apr. 7, 2009.  Summary judgment was granted as to all remaining claims against Officers Pimental, Scopesi, and Oaxaca.  *Id.*  Although Defendants' motion for summary judgment as to Plaintiff's *Monell* claim for municipal liability against the City of Modesto was denied, the parties stipulated to dismissal of that claim on May 14, 2009.  Doc. 56.  Plaintiff's § 1983 excessive force and state law assault and battery claims against Sergeant Crawford and Officer Griepp proceeded to

3

trial.  *See* Doc. 50 (Pretrial Order) at 4.

A four-day jury trial commenced June 9, 2009, Doc. 84, and the jury returned verdicts in favor of both Defendants on June 17, 2009, Doc 88.

## II. BACKGROUND

Defendants assert that, once depositions were completed, Plaintiff should have known certain of her claims were without foundation.  The March 30, 2009 summary judgment decision summarizes the incident based on those depositions:

> It is undisputed that the events giving rise to Plaintiff's arrest took place at approximately 1:00 a.m. on January 14, 2007. Compl. at ¶ 6. At that time, Plaintiff was at a club called the Copper Rhino Sun in the downtown entertainment district of Modesto, California, with approximately ten other individuals celebrating the twenty-first birthday of Plaintiff's son. *Id.* It is also undisputed that Plaintiff consumed three drinks that evening, a small glass of champagne and two white Russians. Margaret Shepherd Depo. at 32, 43-44, 47-48. In almost all other respects, the parties' versions of the events of that evening are in conflict.

> According to the owner of the Copper Rhino, Mr. Leslie Knoll, Plaintiff's group was loud and obnoxious, and at least one member of the group was insulting other customers. Knoll Depo. at 13. After unsuccessfully requesting Plaintiff's group to quiet down, Mr. Knoll contacted one of his private security guards (Defendant Griffin Dye) and told him to remove Plaintiff's group from the bar. *Id.* at 13-14. Dye then informed one of the members of the group, Larry McKenzie, that he was being "a problem" and would have to be walked outside. Dye Depo. at 21.

> According to Plaintiff, Larry ended up on the ground with Dye standing over him. M. Shepherd Depo. at 77. One of Plaintiff's sons, Lucas

4

Shepherd, hollered at Dye "What are you doing? He's just wanting to get his hat." *Id.* Then, according to Plaintiff, there was a lot of pushing and shoving, with people trying to get out of the club. *Id.* at 78; see also Amy Shepherd Depo. at 20. Plaintiff recalls that Dye then grabbed her son Lucas around the neck in a choke hold. *Id.* Other witnesses, including Lucas, recall that Lucas ended up being thrown to the ground by one of the bouncers, possibly Dye. Wheeler Depo. at 20-22; L. Shepherd Depo. at 26, 29-30.

In contrast, Dye recalls that Larry began to leave the premises peacefully and that some other members of the group began to gather up their things to leave with him. Dye Depo. at 23. However, as Dye and Larry were leaving the club's patio, where Larry and the others had been socializing, Dye heard someone yelling from behind him. *Id.* at 23-24. Dye turned around and observed Lucas, who had just entered the patio area from the bar, running after him. *Id.* at 24. The next thing Dye saw was "the ground." He cannot recall whether Lucas knocked him to the ground, or whether he was knocked to the ground by the rush of others leaving the club. *Id.* at 25.

According to Knoll, the club's owner, the situation escalated, resulting in individuals within Plaintiff's group hitting the security guards. Knoll Depo. at 19.

At some point, either while the party was moving outside or shortly after, officers from the Modesto Police Department began arriving on the scene. One of the first officers to arrive was Sergeant Crawford, who observed what he characterized as "a large melee." Crawford Depo. at 41. Crawford noticed eight or nine individuals actively engaged in fighting with security guards on the sidewalk. In response, the security guards were attempting to place handcuffs on certain individuals and trying to arrest the assailants. *Id.* at 32.

A number of police officers eventually responded to the scene, including at least two on horseback. These officers became occupied with the apprehension of various individuals and/or restoring order to the scene.

According to Sergeant Crawford, as he approached the crowd, his attention was drawn to a white,

5

1    female adult (later identified as Plaintiff),
     because she was on the back of a security
2    officer (Dye). She appeared to have her right
     arm around the security officer's throat,
3    holding him in a head lock. Crawford recalls
     that Plaintiff's feet were off the ground, as
4    though she was "riding" on the security
     officer's back. *Id.* at 33, 46. Crawford observed
5    that the same security officer was attempting to
     place handcuffs on a male subject. *Id.* at 46-47.
6    In response, Sergeant Crawford claims he
     approached Plaintiff, grasped her free (left)
7    arm with his left hand, and identified himself
     loudly as a Modesto Police Officer. *Id.* at 33.
8    She did not respond. *Id.* Plaintiff remained on
     the guard's back, screaming: "Let go of my son."
9    *Id.* at 47.

10   Crawford believed that the guard was in "obvious
     distress" during this altercation, because he
11   was in a headlock while trying to handcuff
     someone. *Id.* at 47. Crawford again yelled in
12   Plaintiff's presence that he was a police
     officer, while still holding on to her left arm
13   with his left hand. *Id.* at 49-50. Crawford then
     took Plaintiff's left arm and pulled it up
14   behind her back. *Id.* at 50. He ordered her for a
     third time to release the guard and again told
15   her he was a police officer. *Id.* at 52. Crawford
     then put his right hand on her right shoulder
16   and pulled it straight back, away from the
     security officer. *Id.* Her arm came out from
17   around the guard's neck, and she fell backward.
     *Id.* at 53. According to Crawford, Plaintiff
18   landed on her feet at first, but then stumbled
     and bumped into someone else, knocking that
19   person to the ground and falling on top of that
     person. *Id.* That caused Crawford to lose his
20   grip on her. *Id.*

21   At this point, according to Crawford, Plaintiff
     became hysterical, screaming about her son
22   was being arrested, flailing her arms and feet
     "in all directions, striking out, hitting and
23   kicking anybody in the area." *Id.* at 56.
     Crawford asserts that "[t]rying to gain control
24   of [Plaintiff's] hands and feet was quite
     dangerous at that point." *Id.* at 57. Crawford
25   was standing on his feet, bending over at his
     waist, trying to grab her hands and place her in
26   handcuffs. *Id.* Although he was able to get one
     of her hands, he could not grab the other one.
27   *Id.* That is when Officer Griepp approached. *Id.*
     Crawford waived him over to assist. Griepp was
28   able to grab the other arm. *Id.* She was still

6

1    screaming hysterically and resisting arrest. She
     managing to pull away several times as they
2    placed her in handcuffs. *Id.* at 64-64.

3    Crawford maintains that neither officer placed
     his knees on her back. *Id.* at 64. Crawford
4    asserts that he purposefully avoided doing so,
     because lowering himself to the ground would
5    have allowed her flailing arms and feet to hit
     his body. *Id.* Crawford was also concerned about
6    a nearby horse, belonging to a mounted
     policeman. Crawford did not want to go any lower
7    on the ground, to avoid potential contact with
     the horse. *Id.*
8
     Once Plaintiff was ultimately restrained,
9    Officers Crawford and Griepp escorted Plaintiff
     to a patrol car and placed her in the back seat
10   of that car, where she stayed until being
     transported to another police vehicle for
11   transport to jail. *Id.* at 68:8-19.

12   Crawford's version of events is corroborated by
     Knoll, who testified that he personally observed
13   "the police dragging a lady off who was trying
     to choke [Dye]." Knoll Depo. at 20-21. Knoll
14   stated: "It looked like she was on the pile and
     was trying to either hit or choke him. I just
15   caught a glimpse of it, so I don't know
     exactly." *Id.* at 21.
16
     For his part, Dye does not recall anyone trying
17   to choke him that evening, nor does he have any
     recollection of Plaintiff. Dye Depo. at 33.
18
     Plaintiff's recollection of the arrest is
19   dramatically different [from] Crawford's. She
     asserts that she was propelled outside the club
20   onto the sidewalk with the rush of bodies
     leaving the club. M. Shepherd Depo. at 83.
21   Observing one of the security guards with his
     arm around her son Lucas' neck, she yelled:
22   "What are you doing to my son?" *Id.* The guard
     did not acknowledge her. *Id.* She then reached up
23   to touch the bouncer's arm in order to get his
     attention because she wanted to know what he was
24   doing to her son. *Id.* at 82. Then, with no
     warning or provocation, someone pulled her right
25   arm back and she felt a pain in her shoulder.
     *Id.* at 88. Then, her feet left the ground and
26   she was slammed face first into the ground, onto
     her chest. *Id.* at 89. Plaintiff then recalls
27   feeling a great deal of pressure and pain in her
     back. *Id.* at 91. She felt a weight on her back
28   and her arms were pulled behind her. *Id.* at 92.

1    She recalls that she "couldn't breathe," and her
     arms felt like they were going to be pulled off.
2    *Id.* at 92-93. She was trying to gasp for air and
     then "started seeing stars." *Id.* at 93. Next,
3    she felt pain on her wrists. She assumes this
     was caused by the officers putting handcuffs on
4    her. *Id.* at 94. She was "yanked up to [her]
     feet," at which time she realized police
5    officers were present. *Id.* at 95-96. She was
     then guided to a police car. *Id.* at 96-97.
6
     One witness recalls that Crawford "jumped down
7    onto [Plaintiff's] back, and [ ] had his knees
     in her back." Wheeler Depo. at 25. Others
8    corroborate that at least one of the officers
     had his knees in her back. A. Shepherd Depo. at
9    29; D. Shepherd Depo. at 45.

10   It is undisputed that at the time of the
     incident, Plaintiff was over 50 yeas of age, was
11   5 feet, 4 inches tall, and weighed 150 pounds.
     *Id.* at 80. Crawford was 5 feet, 10 inches tall,
12   and weighed 230 pounds.

13   Ultimately, Plaintiff was cited for a violation
     of California Penal Code section 148 for
14   delaying and obstructing a police officer. The
     police report states:
15
          On 1-14-07 at approximately 0051 hours I
16        responded to a report of a fight at the
          Copper Rhino on 10th St. On arrival I saw a
17        security guard attempting to handcuff a
          suspect on the sidewalk (D) grabbed the
18        security guard around the neck from behind
          and attempted to pull him from her son,
19        Andrew Shepherd. I ordered (D) to release
          the guard and she refused. I pulled (D) by
20        her arms away from the guard and she fell to
          the ground on top of a bystander. (D) began
21        to punch and kick at anyone she could while
          on the ground. I told (D) she was under
22        arrest and to stop fighting. (D) refused and
          continued to fight. (D) was handcuffed by
23        Officer Griepp and myself. (D) booked to
          Stanislaus County jail.
24
     Arrest Report prepared by Sergeant Crawford, Ex.
25   P to Gilbert Decl. , Doc. 30-4 through 30-10.

26   Doc. 43 at 2-8, 2009 WL 839943, *1-*4 (E.D. Cal Mar. 30,

27   2009).

28
                              8

The March 30, 2009 Summary Judgment decision also

reviewed deposition evidence regarding the claims against

Officers Pimental, Scopesi, and Oaxaca.  Plaintiff could

not specifically recall "which officers did what":

> I don't know which officers did what. I just
> know one or two of them threw me to the ground
> and wrenched my arms back so hard I thought they
> were going to be ripped from the sockets at my
> shoulders and then excruciating pain in my back
> making my body bow up backwards and being unable
> to breath. Then being yanked up by the handcuffs
> on my wrists, shoved to a police care (sic) and
> thrown into the back of it. When I tried to
> convey many times the pain I was in and that I
> couldn't breath, at one point I was told, "If I
> could open my big mouth, I could breath." and
> while being transported in the police car, I
> stated the bouncer should not have touched my
> son; the officer replied "Maybe you should have
> stayed out of our town."

2009 WL 839943 at *5 (record citations omitted).  No

person testified that any other officer interacted with

Plaintiff, except Crawford and Griepp.

The March 30, 2009 Decision rejected Plaintiff's

argument that Pimental, Scopesi, and Oaxaca could be held

liable for failing to intercede on her behalf, reasoning

that the undisputed facts did not support imposition of

liability on this theory:

> Plaintiff has not identified any facts
> suggesting any of the three officers were in any
> way involved in her physical restraint and/or
> arrest. Instead, she argues that Officers
> Pimental, Scopesi, and Oaxaca must have been
> aware that she was being subjected to
> "constitutionally unreasonable force during her
> arrest," but "did nothing to prevent the abuse"
> and therefore should be "subject to personal
> liability for their failure to act." Doc. 342 at
> 8. In support of her theory of liability,

9

Plaintiff cites *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986), abrogation on other grounds recognized by *Nolen v. Isbell*, 207 F.3d 1253, 1255-56 (11th Cir. 2000), which held that when "a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."

Defendants rejoin by citing a line of California cases which stand for the proposition that police officers do not generally owe a duty of care to protect members of the public, unless a special relationship is established. For example, *Davidson v. City of Westminster*, 32 Cal. 3d 197 (1982), held that officers conducting surveillance of a business were under no duty to warn an innocent third party known to be alone on the premises of the arrival of a suspected assailant. Neither the decision to conduct the surveillance, the observation of the potential assailant in the victim's presence, nor the recognition of the assailant as the likely perpetrator of a previous assault created a "special relationship" between the victim and the police that gave rise to a duty to act or warn. *Id.* at 206-207; *see also Williams v. State*, 34 Cal. 3d 18 (1983) (California state highway patrol officer has the right, but not the duty to investigate accidents, or come to the aid of stranded motorists, and that stopping to aid an injured or stranded motorist does not, in itself, create a special relationship which gives rise to an affirmative duty to secure information or preserve evidence for civil litigation between the motorist and third parties).

But, the Ninth Circuit recognizes that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).... "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 229 F.3d 1289. If an officer was not present, or had "no realistic opportunity to intercede," no liability will attach. *Id.*

There is scant authority applying "failure to intercede" liability in the context of the use of excessive force. In the corrections context, a prison guard has an affirmative duty to

10

intervene on behalf of a prisoner if other officers are violating the prisoner's constitutional rights in his presence, or if he knows that the prisoner's rights are being violated. *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). However, there must be a causal connection between the defendant and the deprivation of a constitutional right. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In the policing context, where defendant officers failed to act in the presence of an alleged use of excessive force by other officers, "factors such as whether the defendant had reasonable time to intervene, and whether the defendant had tacitly collaborated with the officers using force should be considered." *Garcia v. Grimm*, 2007 WL 2778360, *6 (S.D. Cal.2007) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). The reasoning of the Second Circuit in *O'Neill* is instructive:

> In this case, the claim that [Officer] Conners became liable for use of excessive force by failing to intercede must be assessed separately with respect to the acts of [Officers] Fiorillo and Krzeminski in striking O'Neill and the act of Krzeminski in dragging O'Neill across the floor by his throat. Even when the evidence is viewed in the light most favorable to the plaintiff, there is insufficient evidence to permit a jury reasonably to conclude that Conners' failure to intercede was a proximate cause of the beating. The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator. With respect to the subsequent dragging of O'Neill across the floor, however, the case against Conners is adequate to create an issue of fact for the jury. Having seen the victim beaten, he was alerted to the need to protect O'Neill from further abuse. Though not a guarantor of O'Neill's safety in the face of brutality administered by other officers, Conners can be found liable for deliberately choosing not to make a reasonable attempt to stop Krzeminski.

*Id.* at 11-12. Critically, the evidence in O'Neill subjected the officer to liability for

11

1    "deliberately choosing not to make a reasonable
     attempt" to stop another officer's allegedly
2    unconstitutional conduct because he actually
     observed that conduct.

3

     Here, in contrast, the relevant testimony of
4    Oaxaca, Pimental, and Scopesi, which is
     undisputed, indicates that none of the three
5    officers observed Crawford and/or Griepp placing
     Plaintiff under arrest.

6

     Officer Oaxaca, who was Griepp's partner at the
7    time of the incident, arrived on the scene with
     Griepp in their police cruiser. As soon as they
8    got out of the car, Griepp went to assist
     Crawford, and Oaxaca turned in the other
9    direction to "protect them from the surrounding
     crowd." Oaxaca Depo. at 20. Oaxaca did not see
10   Griepp and Crawford arrest Plaintiff because he
     had his back to them the entire time. *Id.*

11

     Plaintiff emphasizes that, according to
12   Crawford's version of the event, Plaintiff was
     screaming hysterically as she was being
13   handcuffed. Plaintiff argues that even if Oaxaca
     had his back to Plaintiff during the arrest,
14   Oaxaca must have heard her screaming, as it is
     undisputed that he was positioned only a short
15   distance from the site of Plaintiff's arrest.
     However, Oaxaca was not asked during his
16   deposition whether he heard Plaintiff screaming
     over the noise of the melee. Plaintiff's claim
17   is based on no more than speculation. Plaintiff
     has no facts to support her assertion that
18   Oaxaca actually observed (either visually or
     auditorily) the allegedly unconstitutional
19   conduct. Accordingly, no reasonable finder of
     fact could conclude that Oaxaca had a duty to
20   intervene on Plaintiff's behalf. Oaxaca is
     entitled to summary judgment on the First Cause
21   of Action.

22   Officer Pimental, who responded to the Copper
     Rhino on horseback, testified at his deposition
23   that he observed Plaintiff on top of a "dog
     pile" of people. Pimental Depo. 19-20. He
24   observed Sergeant Crawford arrive on the scene,
     but did not have an opportunity to observe any
25   of Crawford's conduct toward Plaintiff because
     his attention was diverted toward other people
26   coming out of the Copper Rhino. Among other
     things, Pimental was distracted by another
27   member of Plaintiff's group, Melody Wheeler, who
     was trying to move around his horse toward the
28   pile of people. *Id.* at 22. Pimental instructed

12

1   her not to move around his horse and to back
    away, but she did not comply. *Id.* at 23.
2   Pimental grabbed Wheeler and escorted her away,
    at which time he handed her off to a ground
3   officer to place her in the car for him. He then
    placed Wheeler under arrest. *Id.* Again, there is
4   no evidence which would permit a reasonable
    finder of fact to conclude that Pimental had a
5   duty to intervene on Plaintiff's behalf.

6   Officer Scopesi, who was also on horseback,
    trying to control the crowd, observed Plaintiff
7   "on the back of a security officer" with her
    "arm around [his] neck from behind." Scopesi
8   Depo. at 22. However, that was all he observed
    in connection with Plaintiff. He did not see
9   officer Crawford approach or take any actions in
    connection with the arrest, because he was
10  dealing with the crowd. *Id.* at 25. No reasonable
    finder of fact could conclude that Scopesi had a
11  duty to intervene on Plaintiff's behalf.

12  Plaintiff has no evidence suggesting that
    Officers Oaxaca, Pimental, or Scopesi observed
13  Crawford and Griepp's conduct in connection with
    her arrest. Defendants Oaxaca, Pimental, and
14  Scopesi are entitled to summary judgment on the
    [Section 1983] Cause of Action.
15
    2009 WL 839943 at *6-*8.  The March 30, 2009 Decision
16
    also concluded that neither Oaxaca, Pimental, nor Scopesi
17
    could "possibly be liable for assault and battery upon
18
    Plaintiff, as it is undisputed that none of them touched
19
    her."  *Id.* at *8 n.3.
20
21      Defendants Crawford and Griepp's motion for summary
22
    judgment on the § 1983 excessive force claim on qualified
23
    immunity grounds was denied because material facts were
24
    in dispute:
25
26          Here, a melee, a potential riot, is a dangerous
            disturbance. However, there are considerable
27          factual disputes about the nature of Plaintiff's
            actions prompting the use of force and whether
28          she resisted arrest. The reasonableness of the

13

> officers' belief that their conduct was lawful
> cannot be determined on summary judgment.
> Viewing the facts in a light most favorable to
> plaintiff, if she was only trying to get the
> security guard's attention to make a request and
> did not resist arrest, a reasonable finder of
> fact could conclude that the force applied in
> this case was objectively unreasonable under the
> circumstances. This is exactly the type of
> factual dispute that is not amenable to summary
> adjudication.

*Id.* at *14.

Although the state law assault and battery claims

against Crawford and Griepp were not directly addressed

in the March 30, 2009 Decision, a similar conclusion can

be implied, as these state law claims would have turned

on the same, disputed material facts.

### III. DISCUSSION

As a general rule, a prevailing defendant is entitled

to an attorney's fee award under a civil rights fee

shifting statute only if the plaintiff's claims were

"frivolous, unreasonable, or without foundation, even

though not brought in subjective bad faith."

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421

(1978).  Because Congress intended to promote vigorous

enforcement of civil rights laws, "a district court must

exercise caution in awarding fees to a prevailing

defendant in order to avoid discouraging legitimate suits

that may not be 'airtight.'"  *See EEOC v. Bruno's*

*Restaurant*, 13 F.3d 285, 287 (9th Cir. 1993).  The

14

Supreme Court warned in *Christiansburg* against the "temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation."  434 U.S. at 421-22.

    Perhaps for this reason, Defendants do not rely directly on a federal fee shifting statute, and instead base their fee petition on Federal Rules of Civil Procedure 37 and 11, as well as California Code of Civil Procedure § 1038.  These provisions must be applied in the usual manner, notwithstanding the general disinclination for awarding fees to prevailing civil rights defendants.  *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 763 (1980) (rejecting argument that civil rights fee shifting statutes supplant other mechanisms of civil procedure designed to sanction counsel for "dilatory conduct").

A.   Rule 37(c)(2) Sanctions.

    Defendants assert they are entitled to an attorney fees award pursuant to Federal Rule of Civil Procedure 37(c)(2), because Plaintiff denied certain requests for admission regarding her allegations of liability.  Doc. 96 at 10-11.

    Throughout her discovery responses, Plaintiff made it

15

clear that she "d[id] not know which officers did what"
to her person.  *See, e.g.,* Responses to Interrogatories
No. 1, 7, 8, 9 & 10, quoted in Doc. 96 at 6-7.  Plaintiff
refused to admit to the following requests for admission
served by Officer Oaxaca, one of the "uninvolved"
officers:

>           **REQUEST FOR ADMISSION NO. 1:**
>           Admit that Officer 0axaca3 did not contact
>           Plaintiff at any time during the incident giving
>           rise to this litigation.
>
>           **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**
>           Deny.
>
>
>           **REQUEST FOR ADMISSION NO. 3:**
>           Admit that Officer Oaxaca did not exercise any
>           force against Plaintiff at any time regarding
>           the incident giving rise to this litigation.
>
>           **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**
>           Deny.
>
>
>           **REQUEST FOR ADMISSION NO. 4:**
>           Admit that Officer Oaxaca is not liable to you
>           for the incident giving rise to this litigation.
>
>           **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**
>           Deny.

*See* Doc. 96 at 7.  The other "uninvolved" officers served
similar requests for admission, which Plaintiff likewise
denied.  *Id.*

     A party who fails to admit a request for admission
risks an award of expenses, including attorneys' fees and
costs, incurred by the other side in proving the matter

16

at trial.  Fed. R. Civ. Proc. 37(c)(2).  Rule 37(c)(2)

provides:

> Failure to Admit. If a party fails to admit what
> is requested under Rule 36 and if the requesting
> party later proves a document to be genuine or
> the matter true, the requesting party may move
> that the party who failed to admit pay the
> reasonable expenses, including attorney's fees,
> incurred in making that proof. The court must so
> order unless:
>
> (A) the request was held objectionable under
> Rule 36(a);
>
> (B) the admission sought was of no substantial
> importance;
>
> (C) the party failing to admit had a reasonable
> ground to believe that it might prevail on the
> matter; or
>
> (D) there was other good reason for the failure
> to admit.

"The Rule mandates an award of expenses unless an

exception applies."  *Marchand v. Mercy Medical Center*, 22

F.3d 933, 936 (9th Cir. 1994).

> Enforcement encourages attorneys and parties to
> identify undisputed issues early to avoid
> unnecessary costs. Failure to identify those
> issues wastes the resources of parties and
> courts.
>
> The Federal Rules are intended "to secure the
> just, speedy, and inexpensive determination of
> every action." Fed. R. Civ. P. 1. Parties may
> not view requests for admission as a mere
> procedural exercise requiring minimally
> acceptable conduct. They should focus on the
> goal of the Rules, full and efficient discovery,
> not evasion and word play.

*Id.* (internal citations and footnote omitted).

17

Defendants maintain that the matters denied by Plaintiff were directly determined by the March 30, 2009 summary judgment ruling that the five uninvolved officers were not involved in Plaintiffs arrest, did not exercise any force against Plaintiff, and were not liable to Plaintiff for the incident giving rise to this litigation.  Doc. 43 at 10-16.

In *Marchand*, relied upon by Defendant, plaintiff became a quadriplegic after doctors failed to diagnose a fracture in his spine.  A jury found several medical professionals negligent in connection with their provision of care to plaintiff.  One defendant, Dr. Farris, was asked to admit: "That the care and treatment provided ... by [Dr.] Farris failed to comply with the applicable standard of care which existed ... on that date."  Farris responded, "denied."  22 F.3d at 937.

Farris argued that Rule 37(c) sanctions should not be imposed because he had "reasonable ground to believe" that he might prevail on the negligence issue.  Fed. R. Civ. P. 37(c)(3).  After examining the evidence, the Ninth Circuit concluded that, even though one expert testified "that Farris satisfied the standard of care in all respects," Farris, "knowing he removed the cervical collar before obtaining a full series of cervical spine

x-rays, could not under the circumstances have reasonably denied his negligence." *Id.*

Likewise, Farris was also asked to admit: "Marchand's quadriplegia was caused by movement of his spine that could have been avoided if proper immobilization had been maintained after he was admitted." *Id.* at 938.   Farris answered:

> Defendants object to this Request for Admission on the grounds that it is compound, ambiguous, and because the use of the phrase "avoidable movement" is vague and undefined. Without waiving such objections, the Request for Admission, couched in its present form, must be denied.

*Id.*  The Ninth Circuit concluded that Rule 37 sanctions were appropriate:

> [T]o aid the quest for relevant information parties should not seek to evade disclosure by quibbling and objection. <u>They should admit to the fullest extent possible, and explain in detail why other portions of a request may not be admitted</u>.

> Farris could have provided frank answers to these requests, which were clearly designed to establish causation. Or he could have "set forth in detail the reasons why [he could not] truthfully admit or deny the matter." Fed. R. Civ. P. 36(a). He did neither, relying on unfounded objections to the wording, instead of admitting the uncontestable question: were Marchand's injuries caused by movement of the spine that could have been avoided had proper immobilization been maintained?

*Id.* (internal citation omitted).

1.   <u>Were Plaintiff's Denials Justified?</u>

Here, Plaintiff denied the requests for admission

concerning bodily contact by the "uninvolved officers,"
_after_ all the officers involved had been deposed.
_Compare_ Doc. 96 at 5 (indicating all officer depositions
were completed by August 8, 2008) _with_ Doc. 96-2, Ex. 5
(Plaintiff's October 17, 2008 responses to requests for
admission).  At that time, Plaintiff possessed no
evidence that any of the uninvolved officers touched her
person, or played a role in her physical arrest, while
all of the accused "uninvolved" officers testified at
their depositions that they had no physical contact with
Plaintiff during the arrest.  In light of these facts and
Plaintiff's clear and repeated explanation in her
interrogatory responses that she had no way of knowing
whether any particular officer had touched her because
she could not see "which officers did what," Plaintiff's
denial of the requests for admission concerning bodily
contact by the "uninvolved officers" was unjustified.
The issue of sanctions will be addressed after all the
challenged responses to requests for admission are
examined.

As for the requests that Plaintiff admit that the
uninvolved officers were "not liable to [her] for the
incident giving rise to this litigation," this seeks a
conclusion of law and Plaintiff responded.  Plaintiff

"had a reasonable ground to believe that [she] might prevail on the matter."  Fed. R. Civ. P. 37(c)(2)(C). She argued that the "uninvolved officers" could be liable on a failure to intercede theory.  Although her argument was ultimately rejected, it was not entirely baseless. Her theory was that, accepting her facts, the other officers on the scene observing excessive force used on her by Crawford and Griepp, should have acted to protect her from injury by stopping their actions that injured her.  Sanctions are not warranted in connection with this request for admission.

A similar result is justified for Plaintiff's denial of requests for admission as to the reasonableness of force used and Defendants Crawford and Griepp:

> REQUEST FOR ADMISSIONS NO. 8:
> Admit that the force used by Defendant officers
> in arresting you was reasonable.
>
> RESPONSE TO REQUEST FOR ADMISSIONS NO. 8:
> Deny.

Doc 96-2, Ex. 6 (Plaintiff's Response to Defendant City of Modesto's Request for Admissions).  She was also asked to admit the conclusion of law that the two officers were not liable:

> REQUEST FOR ADMISSION NO. 5:
> Admit that Officer Crawford is not liable to you
> for the incident giving rise to this litigation.

**RESPONSE TO REQUEST FOR ADMISSIONS NO. 5:**
Deny.

Doc 96-2, Ex. 7 (Plaintiff's Responses to Defendants Crawford's and Griepp's Requests for Admissions).

Plaintiff "had a reasonable ground to believe that [she] might prevail on the matter."  Fed. R. Civ. P. 37(c)(2)(C).  She gave a different description of her conduct and the excessive and violent nature of force used against her.  These facts were categorically disputed.  Liability issues turned on resolution of the two conflicting versions of the encounter.  The excessive force claim survived summary judgment, because other witnesses in part corroborated her description as facts and inferences had to be interpreted in favor of Plaintiff.  The jury did not accept Plaintiff's version and ultimately found for defendants.

Plaintiff's only basis to deny the uninvolved officers' requests that she admit that they did not have any physical contact with her was based on her inability to identify the number and identity of officers with whom she interacted.  However, this is the purpose of discovery.  All other challenged denials were justified.

2.  **Rule 37 Sanctions Are Not Appropriate.**

Defendants are entitled to an award of "reasonable expenses" incurred to prove that Officer Pimental's,

Oaxaca's, and Scopesi's physical contact with Plaintiff was nonexistent to minimal.  Depositions had already been taken prior to Plaintiff's response to the requests for admission.  No deposition costs are recoverable.

In cases of this nature, defense counsel was required to spend time reviewing the depositions of all witnesses to determine the extent of any physical contact between Plaintiff and Officers Pimental, Oaxaca, or Scopesi. Here, however, no evidence, e.g., relevant passages from the officer's deposition testimony demonstrating that they never came into contact with Plaintiff, was presented to the court as part of a motion for summary judgment and associated statements of fact.  Plaintiff had no evidence of any kind as to these three officers, except that they were on the scene.

Defendants' motion for summary judgment included two paragraphs on the subject of the uninvolved officers:

> Plaintiff bears the burden of stating sufficient facts to support a claim against every named Defendant. To the extent a Plaintiff fails to meet this burden, her claims may be challenged by a Motion for Summary Judgment, which may be granted if the pleader is unable to produce facts supporting the claims plead. (De La Cruz v. Tormey, 582 F.2d 45, 64 (9th Cir. 1978).) The basic pleading standard for civil rights complaints calls for inclusion of clear, factual allegations in support of each cause of action, and that such allegations are not vague or based on mere conclusions. (Ivey v. Board of Regents, 673 F.2d 266 (9th Cir. 1982); Sherman v. Yakahi,

549 F.2d 1287, 1290 (9th Cir. 1977).) Claims may be dismissed because they fail to allege sufficient facts to support any cognizable legal claim. (Smilecare Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 783 (9th Cir. 1996).) The basic pleading standard for civil rights complaints calls for inclusion of clear, factual allegations in support of each cause of action, and that such allegations are not vague or based on mere conclusions. (Ivey, 673 F.2d at 266; Sherman, 549 F.2d at 1290.)

Here, it is important to note what the factual allegations in the Complaint do not say. The allegations do not describe with particularity the "wrongdoing" by any of the five officers. The Complaint merely alleges that the five officers were present during the melee in which she was arrested. Further, [Plaintiff's] own allegations confirm that only two officers (Officers Crawford and Griepp) were involved in [Plaintiff's] arrest. (Plaintiffs Complaint at 7 10.) This is further confirmed by [Plaintiff's] own testimony and responses to written discovery wherein she confirms to have no facts or knowledge pertaining to any improper allegations by any of the five uninvolved officers. [Plaintiff's] failure to allege any facts to support her claims as against the uninvolved five officers (Officers Angarole, Musto, Pimental, Scopesi or Oaxaca) require Summary Judgment to be granted on each of their behalf.

Doc. 30-2, at 9-10.

The portion of Defendant's separate statement dedicated to this issue adds little:

24

**ISSUE 1:** Plaintiff has Failed to Allege Any Facts Against the Five Uninvolved Officers: Officers David Angarole, Todd Musto, Joseph Pimental, Tony Scopesi and Yair Oaxaca

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. Plaintiff's Complaint fails to set forth any facts to support her causes of action as against the five uninvolved officers. | Plaintiff's Complaint generally. |
| 2. Plaintiff admits that the only officers who arrested her and had any physical interaction with her during her arrest were Officers Crawford and Griepp. | Plaintiff's Complaint at ¶ 10; Plaintiff's Responses to Officer Crawford's Special Interrogatories, Set One, Nos. 1, 7, 8, 9, 10 and 11. |
| 3. Officers David Angarole, Todd Musto, Joseph Pimental, Tony Scopesi and Yair Oaxaca were not involved in Plaintiff's arrest and did not touch Plaintiff during the incident. | Plaintiff's Complaint at ¶ 10; Plaintiff's Responses to Officer Crawford's Special Interrogatories, Set One, Nos. 1, 7, 8, 9, 10 and 11. |

Doc 30-3 at 2.    Defendants' Response dedicated a large

section to rebutting Plaintiff's failure to intercede

theory, but contained no new argument or facts concerning

the simple factual issue of whether Officers Pimental,

Scopesi, and/or Oaxaca ever touched Plaintiff.  Doc. 34.

    Instead, the court had to expend considerable

judicial resources reviewing the record for relevant

evidence.  The result of this effort, which is summarized

and analyzed in the March 30, 2009 Decision, demonstrated

that the undisputed evidence supported the conclusion

that Officers Pimental, Scopesi, and/or Oaxaca never came

into physical contact with Plaintiff.  Given that

Defendants provided essentially no record evidence

relevant to this inquiry and gave the court no assistance

in their papers, it is reasonable to conclude that they

25

expended no resources "proving" the lack of physical

contact between Plaintiff and Pimental, Scopesi, and/or

Oaxaca; rather, the Court did this work and analysis.

Defendants' request for Rule 37(c) sanctions is DENIED.

B.    **Rule 11 Sanctions.**

    Alternatively, the uninvolved officers move to

recover their defense costs as sanctions under Federal

Rule of Civil Procedure 11, on the ground that Plaintiff

continued to prosecute her case against them despite

clear evidence confirming the five officers were

"uninvolved" in her arrest and inferentially presented a

"pleading, motion, or other paper that was not supported

by evidence." *Id.* at 11-13.  This motion fails for the

same reason that Plaintiff was entitled to deny the

uninvolved officers' requests for admission regarding

liability.  Plaintiff argued that the "uninvolved

officers" could be liable on a failure to intercede

theory.  Although her argument was ultimately rejected by

the jury, it was not baseless.  Sanctions are not

warranted in connection with her continued prosecution of

claims against these officers.

C.    **California Code of Civil Procedure § 1038.**

    Finally, Defendants rely on California Code of Civil

Procedure ("CCCP") § 1038, which authorizes a court to

order reimbursement of attorney's fees incurred defending against any claim brought under the California Tort Claims Act ("CTCA") upon a finding that the claims were not brought in good faith and with reasonable cause. Defendants assert that Plaintiff brought her action against the five "uninvolved" officers without reasonable cause, and maintained claims against them despite the fact that discovery "confirmed that only two of the seven officers ever touched her or were in any way involved in her arrest." Doc. 96 at 14.

Any recovery of fees under CCCP § 1038 is expressly limited to expenses incurred defending against the state law claims brought under the CTCA. *See* CCCP § 1038 (allowing award of attorney's fees "[i]n any civil proceeding under the [CTCA]....").  Before denying a motion for fees brought under CCCP § 1038 a trial court must find that a "plaintiff brought the action with a good faith belief in the action's justifiability and with objective reasonable cause." *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center*, 19 Cal. 4th 851, 862 (1998).  The good faith and reasonable cause requirements pertain not only to the action's initiation but also its continued maintenance. *Curtis v. County of Los Angeles*, 172 Cal. App. 3d 1243, 1252 (1985).

1    Here, just as it was reasonable for Plaintiff to

2    maintain her § 1983 excessive force claims against

3    Officers Crawford and Griepp, so too it was objectively

4    reasonable for her to maintain the assault and battery

5    claims against them.  The relevant facts were disputed.

6

7    The required bad faith cannot be established.

8    Even if, *arguendo*, the assault and battery claims

9    against Pimental, Scopesi, and/or Oaxaca are viewed

10   differently, once all witnesses and parties had been

11   deposed, Plaintiff should have known that there was no

12   evidence to support a finding that any of the three

13   officers touched her or threatened to touch her in any

14   way.  Plaintiff did not argue that Pimental, Scopesi,

15   and/or Oaxaca could be liable for assault and/or battery

16

17   on some alternative theory not requiring physical contact

18   or threatened physical contact.  Accordingly, Plaintiff

19   cannot justify maintenance of the assault and battery

20   claims against Pimental, Scopesi, and Oaxaca from the

21   close of depositions in August 2008 to the issuance of

22

23   the summary judgment decision on March 30, 2009.

24   However, Defendants spent almost no time on this

25   aspect of the Summary Judgment motion and they have not

26   reasonably apportioned the time spent.  The motion is

27   DENIED.

28
                              28

There is also the matter of the false arrest claim against all defendants that was voluntarily dismissed shortly before trial.  If force used was excessive in Plaintiff's version was believed -- there was no reason for arrest.  The motion is DENIED.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion for attorney's fees and/or sanctions is DENIED in its entirety.

SO ORDERED
Dated: January 6, 2010

<u>/s/ Oliver W. Wanger</u>
Oliver W. Wanger
United States District Judge